# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **RICARDO ALBERTO VILLA-GUILLEN**, **a.k.a. "EL GATO,"** <br> Defendant. | Criminal No. 17-608 (FAB/BJM) |

## REPORT AND RECOMMENDATION

Ricardo Alberto Villa-Guillen ("Villa") was charged with two counts of possession with intent to distribute controlled substances, 21 U.S.C. § 841(a)(1), and one count of possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A). Dkt. 1. Villa filed a motion to suppress evidence found after a search warrant was executed at his residence, Dkt. 28, and a supplemental motion challenging a consent search of his vehicle. Dkt. 34. The government opposed. Dkts. 39, 40. This matter was referred to me for a report and recommendation. Dkt. 36. Hearings were held on December 21, 2018 and February 27, 2018. Dkt. 49; Dkt. 57. Transcripts were created. Dkts. 60, 61, 62. The parties filed post-hearing briefs. Dkts. 68, 69.

For the reasons set forth below, the motions should be **DENIED**.

## APPLICABLE STANDARDS

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The central inquiry is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *United States v. Weikert*, 504 F.3d 1, 6 (1st Cir. 2007) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). Areas in which an individual does not have a reasonable expectation of privacy are not entitled to Fourth Amendment protections because "'the Fourth Amendment protects people, not places.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). In general, "[a] nonconsensual search or seizure is unreasonable in the absence of a

judicial warrant issued upon probable cause." *Ahern v. O'Donnell*, 109 F.3d 809, 816 (1st Cir. 1997).

A warrant to search may be issued where there is probable cause, a fluid standard measured by whether the totality of the circumstances support a reasonable person's belief that a crime has been or is being committed. *See Illinois v. Gates*, 462 U.S. 213, 235 (1983); *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949). Warrants issued on probable cause must be "supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The affidavit describing the place to be searched and items to be seized must give the issuing magistrate a substantial basis to conclude that probable cause exists. *Gates*, 462 U.S. at 239. An "affidavit supporting a search warrant is presumptively valid," *United States* v. *Gifford*, 727 F.3d 92, 98 (1st Cir. 2013), but a "defendant may attempt to rebut this presumption and challenge the veracity of the affidavit." *United States* v. *McLellan*, 792 F.3d 200, 208 (1st Cir. 2015), *cert. denied*, 136 S. Ct. 494 (2015). The Supreme Court established the mechanism for doing so in *Franks* v. *Delaware*, 438 U.S. 154 (1978).

A defendant may overcome the presumption of validity and obtain an evidentiary hearing, or *Franks* hearing, if he can make a "substantial preliminary showing" that "a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth" and that the "falsehood or omission [was] necessary to the finding of probable cause." *McLellan*, 792 F.3d at 208. This is a heavy burden. To satisfy the first prong, the defendant must make more than conclusory allegations; he must prove knowledge or reckless disregard by a preponderance of the evidence. *See Franks*, 438 U.S. at 171; *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015). To satisfy the second prong, the defendant must demonstrate that the alleged falsity or material omission was necessary to the judge's finding of probable cause. *United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012). If, notwithstanding the alleged falsity there remains probable cause to issue a warrant, then a *Franks* hearing is not required. *Franks*, 438 U.S. at 171–72.

Warrants are not the only mechanism by which the government may conduct a reasonable search of a person or property, however. Consent is a "recognized exception to the Fourth

Amendment's warrant requirement, but the government bears the burden to prove by a preponderance of the evidence that defendant or an authorized third party gave the consent voluntarily." *United States v. Vanvliet*, 542 F.3d 259, 264 (1st Cir. 2008) (internal citations omitted). "The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search." *United States v. Winston*, 444 F.3d 115, 121 (1st Cir. 2006) (internal marks omitted). Factors relevant to voluntariness include but are not limited to: (1) the consenter's age, education, past experiences, and intelligence; (2) whether the police officers informed the consenter of his constitutional right to refuse consent; (3) the length and conditions of the consenter's detention and/or questioning; and (4) law enforcement's use of any inherently coercive tactics. *Vanvliet*, 542 F.3d at 264 n.2. Consent may be invalidated if an illegal act tainted it by significantly influencing the defendant to give consent. *United States v. Delgado-Pérez*, 867 F.3d 244, 256–57 (1st Cir. 2017).

Inventory searches are another exception to the warrant requirement. An inventory search is a routine search conducted by law enforcement officers to itemize personal property in law enforcement custody. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 371 (1976). Probable cause to search is irrelevant; an inventory search is consistent with the Fourth Amendment because it is reasonable for law enforcement to protect owner's property as well as protect police against potential false claims of theft. *Bertine*, 479 U.S. at 369–70; *Illinois v. Lafayette*, 462 U.S. 640, 646 (1983); *United States v. Davis*, 909 F.3d 9, 17 (1st Cir. 2018). As with other Fourth Amendment searches, an inventory search is reasonable if the circumstances objectively justify the action. *Boudreau v. Lussier*, 901 F.3d 65, 73 (1st Cir. 2018) (citing *Scott v. United States*, 436 U.S. 128, 138 (1978)). If an inventory search is conducted according to routine, standardized procedure, then an officer's subjective intent is not relevant. *Boudreau*, 901 F.3d at 73 (citing *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006)).

Vehicle impoundment falls under a third exception to the Fourth Amendment's warrant requirement: community caretaking. *Dakota*, 428 U.S. at 368–69; *Davis*, 909 F.3d at 16. Police may constitutionally impound a vehicle if it impedes traffic, risks vandalism, threatens public

safety, or causes an inconvenience. *Davis*, 909 F.3d at 16 (citing *Dakota*, 428 U.S. at 368–69; *Jaynes v. Mitchell*, 824 F.3d 187, 197 (1st Cir. 2016)). Where impoundment is reasonable, other investigatory motives for seizing the vehicle are not relevant. *Davis*, 909 F.3d at 17 (citing *Boudreau*, 901 F.3d at 72). Police may conduct an inventory search of an impounded vehicle without obtaining a search warrant in order "'to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" *Davis*, 909 F.3d at 17 (quoting *Bertine*, 479 U.S. at 372).

## BACKGROUND

During the suppression hearings, the court heard testimony from Puerto Rico Police Department ("PRPD") officer and Drug Enforcement Administration ("DEA") Task Force member Victor Salgado and from defendant Ricardo Villa-Guillen.

Salgado and his partner, DEA Special Agent Jose Rebollo, were looking for several people with federal arrest warrants. The DEA Task Force gave Salgado a warrant for Villa on June 23 or 24. Salgado had spoken to the administrator of the condominium where Villa lived because he initially had planned to arrest Villa on the day of the indictment, which resulted in that arrest warrant. Salgado visited the apartment in the afternoon a few days after receiving the warrant, but no one answered. He did not break in or force entry. These visits were not included in the search warrant affidavit. Around 5 p.m. on July 17, 2017, Salgado and Rebollo drove to Villa's sister's home to look for Villa. *See* Ex. 1 (arrest warrant for Villa).

**Arrest**

At Villa's sister's home, Salgado saw two men exit; one was Villa and the other turned out to be his son. Villa testified that he left around 5:30 with his son to drive to the mall. The officers recognized Villa. Villa and his son got into a Mercedes SUV that was parked around the corner. *See* Ex. 2 (car, pictured after seizure). Neither officer interfered out of concern for their safety, believing Villa would be armed. With Villa behind the wheel, he and his son drove to the highway and headed toward San Juan. The officers followed at a distance in their Chevy Tahoe and communicated with reinforcements.

At the exit for the mall, rush hour traffic and their buffer distance caused Salgado and Rebollo to lose sight of Villa, who drove fast and frequently changed lanes. Salgado thought Villa might have noticed him following in the Tahoe, which looks official, in Salgado's opinion. They next spotted Villa entering a multifloor parking garage at the mall and continued to follow him.

Two more agents, "Ruiz" and "Arenas," met Salgado and Rebollo for a total of four officers. Villa testified that there were six or eight agents at the scene. The agents blocked Villa with their cars at either end of an aisle in the parking garage. The officers exited their cars. Salgado shouted, "Police, police! Raise your hands!" because it looked as if Villa were reaching beneath his seat. Salgado drew his gun and held it at a forty-five-degree angle to Villa. Salgado used his left hand to open the driver-side door. He testified that Villa was breaking a phone by twisting in his hands, Dkt. 62 at 10:22–11:12, and that breaking prepaid phones would prevent law enforcement from accessing stored information. *Id.* Villa disputes breaking a cell phone. Dkt. 60 at 19:13–25.

Salgado stated that he took the pieces of phone and arrested Villa and his son around 6:00 p.m. Dkt. 62 at 11:2. Salgado handcuffed them, gave oral warnings, and searched Villa's person. Villa explained that the boy was his son and a minor and asked the officers to let the boy drive the car home. Instead, the officers put them into police vehicles and transported them to their offices at Metro Office Park. Salgado testified that for safety reasons officers did not call a family member to take custody of Villa's son at that time—the mall was full, and three cars blocked the aisle. Ruiz and Arenas drove Villa and his son. Villa testified that no questions were asked during the car ride. Rebollo drove the Chevy Tahoe in which he and Salgado arrived. Salgado drove Villa's Mercedes. Salgado stated that he did not search the vehicle during the drive and did not see a weapon or contraband in plain view. He did not believe that he was in danger while driving. At that time, he did not have a search warrant for the vehicle. He parked at the office around 6:15 or 6:20 p.m. and did not search the vehicle there either. Salgado testified that no search occurred until Villa signed the consent form. Salgado testified that he did not intend to keep the car in DEA custody.

**Interview**

Villa and his son sat on a bench in the reception area at Metro Office Park. Salgado was not armed in the office. Salgado asked Villa's son if it was true that he was a minor and if Villa was his father. Villa's son answered both questions affirmatively. Salgado testified that he arrested the boy because he would be Salgado's responsibility if he were really a minor. Salgado also needed to secure the car and Villa's personal property, and the boy was with a person who had a federal warrant out for his arrest. Dkt. 62 at 59:6–21. Salgado testified that, prior to any interrogation, he asked for a person to whom Villa could hand over his son and his personal belongings. He testified that Villa identified his sister and provided her name and phone numbers. Salgado testified that he called Villa's sister, introduced himself, confirmed her identity, and explained the situation generally. Salgado asked her to take custody of Villa's son and belongings, and she agreed to do so.

At some point, Salgado separated Villa from his son to question Villa in a room. Villa's son remained in the reception area. Salgado testified that only Arenas and Rebollo were present, but Villa testified that there were between four and six agents in the room, that two stayed off to the side, one sat beside him, one sat across from him, and two other agents went in and out. Salgado testified that a fourth agent did enter at one point to tell Salgado that Villa's sister had arrived, but otherwise there were no more than three agents in the room. According to Salgado's testimony, Rebollo also came in and out because he was working on the affidavit for the criminal complaint in this case. Salgado does not recall if Villa remained handcuffed during the interview, but his standard practice is to keep interview suspects handcuffed, with their hands in front.

Salgado read Villa his *Miranda* warnings and gave him a *Miranda* warning document to read and sign. Ex. 3 (signed by Villa, Arenas, and Salgado on July 17, 2017 at 7 p.m.). Salgado testified that the fourth agent entered around 6:45 or 6:50 p.m. to notify him that Villa's sister arrived.[1] Salgado then stepped out to speak with her and ask for more time to talk to Villa. Salgado introduced himself, and she agreed to answer some questions. Villa's sister said Villa did not live

---

[1] Villa's testimony, discussed later, contradicts the timing of his sister's arrival.

with her, and Villa had owned the Mercedes for one or one-and-a-half years. Salgado then asked if he could speak with Villa's son in front of her, and she agreed. Villa's son, in response to questioning, said that the car was his father's, that Villa had owned it for about a year, that he lived with Villa and his sister lived with Villa on weekends, and that Villa and his son were heading to the gym when officers stopped them.

Salgado then notified Villa that his sister had arrived. During that time, Villa began to sign and initial the document before the interview began. He wrote "yes" to understanding his rights. Villa testified that he signed the document and immediately told agents that he did not want to answer questions. Salgado recalled that Villa paused before signing the *Miranda* warning document. According to Salgado, Villa began expressing doubts and wanted to know the advantages and disadvantages of answering questions. Salgado estimated that he spent thirty minutes, maybe more, answering Villa's questions on this topic, and that he told Villa that everything Villa said could be used against him. Villa, Salgado said, insisted that he wanted to say some things but that the Mercedes was not his and that he only had the Mercedes for twenty-four hours. Villa would not say who owned the Mercedes or who lent it to him. Salgado told Villa, "[Y]ou have to answer the question in order for me to be able to ask you." Dkt. 62 at 19:10–11. Salgado clarified for counsel, "I just wanted him to answer if it was—that question, if he was willing to talk to me. Otherwise I was not able to ask him questions." *Id*. at 19:17–19.

Villa then told Salgado that his son did not live with him, and his kids visited him only on the weekend. Around this time, the officers discovered that the Mercedes was registered to someone other than Villa, and confronted Villa. Villa said that he did not know that person, but he and the Mercedes owner had swapped cars. Villa could not say the make of his own car. Salgado accused Villa of lying and told him that lying would harm him more. Villa then wrote "no" on the notice of rights in response to whether he wanted to answer questions. The document does not include a notation that this portion of the form was signed later, nor is there a notation about the exchange between Villa and the officers. Salgado testified that he thought Rebollo included the question and answer between the men but that it was not in Salgado's own notes or reports.

Agents then asked for consent to search the Mercedes. Villa refused, and he testified that this provoked a hostile attitude from the agents, who started to threaten him. Villa testified:

> They threatened me that if I didn't give them my consent, that it was going to be worse for me. They established that if I did not give them my consent, they were going to get in touch with Social Services so that my minor son could be removed from my house, from my family.

Dkt. 60 at 10:11–16. Villa testified that he felt "[i]ntimidated. Very intimidated. Obviously threatened." *Id.* at 10:19. He asked agents not to treat him that way and repeated that his son had nothing to do with it. For about an hour, Villa testified, agents threatened him; one told another to call social services to see if someone could pick up Villa's son. *Id.* at 11:1–8. Villa testified that there was no physical intimidation, no agent touched him, no firearm was pointed at him, and no agent threatened to use physical violence or a firearm. Villa signed the consent form at 8:00 p.m. because of those threats, and he stated that he answered "no" to the question "were you threatened" because the agents told him to do so. *Id.* at 12:5–8. Salgado testified that no one made any threats, mentioned social services, or otherwise forced Villa to sign the forms. Dkt. 61 at 10:25–11:12.

Villa spoke more about the Mercedes. He told Salgado that he had to return it, and Salgado said that the officers would have to inventory the car before they could give it to his sister and could not give the car to his son because he was a minor. Salgado testified that Villa seemed to be in a hurry to have the car returned. Villa testified that he cared about the car being searched because it had been lent to him. Salgado told Villa that the officers would use a search warrant to inventory the car unless Villa consented to its search. Salgado testified that he still had no intent of keeping the vehicle in DEA custody. Villa said that, because he had the car for under twenty-four hours, anything in it wasn't his. After making his caveat clear, Villa signed the consent form and wrote "not mine" on it. Ex. 4. According to the consent form, it was signed at 8:00 p.m. Salgado explains that it was signed an hour after the Miranda warnings because Villa had so many questions, the officers had to prepare the form, and Villa ate in the interim. Villa testified that he signed the form in exchange for agents' allowing him to call a relative to pick up his son. Salgado testified that no

agent issued a threat of any sort against Villa or his minor son. Dkt. 61 at 10:25–11:12. Salgado testified that no threats were made to get Villa to sign any forms. Dkt. 61 at 11:9–12.

Villa testified that he had possession of the vehicle for twenty-four hours before the stop and had driven it "several times." He refused to conjecture and testified only that he drove the care more than twice. Villa testified that his friend Juan "El Flaco" lent it to him. Villa testified that he met Juan at the gym about three years ago, that he lives in Santurce, and Villa does not know his address. Villa described the Mercedes as a cheap car, worth about $8,000. Villa did not give the agents Juan's phone number or ask the car to be released to Juan. Villa testified that the Mercedes was not his and that he was not the main driver, although he had driven it more than once during the year or a year-and-a-half leading up to July 2017. Villa also testified that his sister told him that she had been threatened and harassed.

Villa testified that he signed the form in exchange for agents' allowing him to call a relative to pick up his son. Villa provided his sister's phone number to Salgado so she could come and pick up his son, the Mercedes, and Villa's personal property. He testified that Salgado called his sister after 8:00 p.m. on a personal phone, though the call could have been before or after he signed the form. Villa was present during the phone call.

**Vehicle Search**

After divergent testimonies about what occurred in the interview room, Salgado and Villa's testimony about the search largely match.

Salgado did not have a search warrant for the car or an order to impound the vehicle. Salgado testified that it is DEA policy to perform an inventory search of a vehicle before returning it to avoid allegations that items were stolen, to preserve valuables, for the safety of agents, and for the safety of the person to whom the vehicle is released. Salgado described a standard inventory search as including the seat, door compartments, trunk, glovebox, floor mats, and anywhere a normal person could have access inside a vehicle.

Salgado conducted the search. Villa, his sister, his son, and his daughter were all present at the car search. No one objected. Villa stated, according to Salgado, "If something shows up, it's

not mine." Salgado testified that Villa repeated this more than five times. Villa also told Salgado that the glovebox of the Mercedes did not open. Salgado recovered from the vehicle a phone bill addressed to Villa, a photo of Villa, Villa's social security card, and Villa's driver's license. Ex. 5–8. Villa testified that the vehicle also contained his black gym bag, his wallet, and his cell phone. Salgado also found a bag containing controlled substances in the driver's side door compartment. Salgado found what was later identified as a kilogram of cocaine in the glovebox, which he opened after fiddling with the handle. Ex. 10. The cocaine was inside a folded white bag.

**Search Warrant**

After agents mirandized Villa on July 17, he informed them of an address in Guaynabo, Puerto Rico and stated that he lived there with his two children. The next day, Rebollo applied for a search warrant for that address. Dkt. 28-2 at 3–4. In his affidavit, Rebollo cited a June 23, 2017 superseding indictment filed against Villa and others charging them with a drug trafficking-related conspiracy. *Id.* at 2 (citing Case No. 16-cr-526-FAB Dkt. 120). Rebollo stated that DEA agents arrested Villa and searched the vehicle he drove at the time of arrest. Rebollo described in the affidavit the fruits of the vehicle search: "one hidden compartment, one brick shaped object of suspected cocaine, a 'rock' of suspected cocaine, lubricant for firearms, correspondace [sic] in VILLA-Guillen's name and the TARGET PROPERTY's address, apartment keys, and a gate beeper." *Id.* 3. Rebollo noted that the "brick-shaped object" had been tested and "yielded positive for cocaine." *Id.* Rebollo further stated that Villa's sister and son also provided the Guaynabo address to him as Villa's residence. *Id.* at 3–4. Finally, Rebollo noted that "[a] reliable DEA Confidential Source (CS) stated that VILLA-Guillen kept money, firearms and drugs in his residence (i.e. **TARGET PROPERTY**). The CS further stated that VILLA-Guillen has hidden compartments in his house where he stashes drug proceeds, firearms and controlled substances." *Id.* at 4.

Rebollo had been a DEA Special Agent for just over two years at the time he applied for the search warrant. Dkt. 28-2 at 4. In his search warrant affidavit, he listed various characteristics common to "people who deal in illegal controlled substances." *Id.* at 5–6. The list included a

tendency to "keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences, businesses, and automobiles." *Id.* at 6.

Salgado and other agents twice visited the condominium complex in which Salgado lived prior to executing the search warrant. Salgado first visited and spoke with the complex's administrator in an attempt to locate Villa before the indictment came down. Dkt. 62 at 39:11–20. Salgado visited again after the arrest warrant was issued. Dkt. 62 at 41:6–42:8. The second time, Salgado knocked on the door, but no one answered. He did not enter the apartment, nor did the agents with him. *Id.*

## DISCUSSION

The parties agree that the federal arrest warrant, at Docket No. 3, was valid. The disputes lie in whether the search of the vehicle and the subsequent search of Villa's apartment were lawful. *See* Dkt. 28; Dkt. 68; Dkt. 69.

*Vehicle Search*

The government begins with a basic tenet of Fourth Amendment privacy protections and contends that Villa lacked any reasonable expectation of privacy in the vehicle. Dkt. 68 at 4. Villa argues that the government's impoundment, transfer, and search of the vehicle were not justified by law and that the government coerced him to consent. Dkt. 69.

The court evaluates a reasonable expectation of privacy through an individual's actual expectations of privacy and whether that subjective expectation is objectively reasonable. *Carpenter v. United States*, 138 S. Ct. 2206, 2209 (2018) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). The proponent of a motion to suppress must prove his reasonable expectation of privacy in the place or items searched. *Rakas v. Illinois*, 439 U.S. 128, 148 (1978); *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991); *United States v. Bouffard*, 917 F.2d 673, 675 (1st Cir. 1990) ("it is incumbent upon the defendant to establish not only unlawful police conduct, but that the unlawful conduct intruded upon some legitimate expectation of privacy").

There is no bright-line rule to determine whether a person who borrows a vehicle with the owner's permission has a reasonable expectation of privacy in the vehicle. *United States v.*

*Almeida*, 748 F.3d 41, 47 (1st Cir. 2014). The court may weigh "'ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case.'" *Id.* (quoting *United States v. Aguirre*, 839 F.2d 854, 856–57 (1st Cir. 1988)). Essentially, the question is "whether or not the individual thought of the place (or the article) as a private one, and treated it as such." *Id.*

Here, Villa possessed the vehicle, even though he repeatedly professed to officers that it was not his, going so far as to disclaim ownership on the signed consent form. *See* Ex. 4. Villa's sister and son informed Salgado, however, that Villa had owned the vehicle for at least a year. Villa testified that he had driven the car on occasion over the past year or eighteen months, but he had only possessed the car for twenty-four hours leading up to his arrest in this case. Villa told officers that the vehicle was registered to another person, whom Villa identified as his friend Juan, "El Flaco." The defendant in *United States v. Sanchez* similarly borrowed a car from "from a friend about whom he knew very little—not even his last name." *Sanchez*, 943 F.2d at 114. "A pattern of permission, together with his sole control on a long trip, would have minimized the informal and temporary nature of this specific acquisition of the car," further strengthening privacy expectations. *Id*. Villa was in full control of the car, and the search eventually turned up personal belongings, phone bills, and a photograph of Villa.

Permitted, repeated use without the presence of the owner, however, does not alone establish a reasonable expectation of privacy. Courts look to see whether the defendant has an "intimate relationship" with the vehicle. Villa vehemently denied such a relationship with this vehicle. He testified that he drove it "several times" only, contrary to his son and sister's statements to Salgado. Like the defendant in *Sanchez*, Villa also disclaimed interest in the items seized, stating to Salgado multiple times, "If something shows up, it's not mine." This reduces any expectation of privacy because it expressly disclaims an interest in anything contained within the car. *Sanchez*, 943 F.2d at 114. His words again were at odds with the personal items found in vehicle. In one

case, a defendant who drove another person's truck with permission but lacked a pattern of use had no reasonable expectation of privacy over the truck's contents. *Almeida*, 748 F.3d at 48. In contrast, a rental car driver has a reasonable expectation of privacy in a rental car. *Byrd v. United States*, 138 S. Ct. 1518, 1524 (2018). At the suppression hearing, Villa could or would not say how often he had borrowed it over the course of a year, and he did not recall the first time he used the vehicle. Dkt. 60 at 13:11–17:7.

The First Circuit, in *Almeida* and *Aguirre*, required more than mere possession of a vehicle with the owner's permission. *See* Dkt. 34 at 3–5. The inquiry into whether there is a reasonable expectation of privacy considers the factors in *Aguirre* but boils down to whether the driver also retains a subjective expectation of privacy in the vehicle. *Almeida*, 748 F.3d at 47 (citing *Aguirre*, 839 F.2d at 857). Both a subjective and an objective expectation of privacy must be present.

According to Villa's sister and son, Villa owned the vehicle and had driven it for at least a year. This resembles the continued use and intimate relationship a rental car driver might have, whereas Villa's professed sporadic usage would prevent a reasonable expectation of privacy. By explicitly and repeatedly rejecting an "intimate relationship" with the vehicle, Villa undermined his Fourth Amendment protections against its search. *See United States v. Fermin*, 771 F.3d 71, 76 (1st Cir. 2014) (citing *United States v. De Los Santos Ferrer*, 999 F.2d 7, 9 (1st Cir. 1993) ("It is well established that one who abandons or disclaims ownership of an item forfeits any claim of privacy in its contents, and that as to that person the police may search the item without a warrant.")); *see also United States v. Andujar-Aponte*, Case No. 09-096, 2010 WL 597483, at *9 (D.P.R. Feb. 10, 2010). Villa's persistent disavowals of the vehicle and its contents demonstrate a lack of subjective privacy interest in the vehicle. *See Carpenter*, 138 S. Ct. at 2209. His explicit disclaimers and failure to prove a reasonable expectation of privacy or otherwise walk back those disclaimers leaves him without Fourth Amendment protections.

Accordingly, the court should find that Villa lacked a reasonable expectation of privacy in the vehicle, so there could not have been a Fourth Amendment violation when Salgado searched the vehicle. However, should the court find that Villa indeed had a reasonable expectation of

privacy, then the inquiry shifts to whether there existed an exception to the Fourth Amendment warrant requirement. I will therefore proceed to consider the constitutionality of the vehicle impoundment and the inventory search.

As a threshold matter, Villa objects to the government's inventory search theory because the government failed to make that argument in its opposition to the motion to suppress. Dkt. 69 at 5 n.1. The government did make the argument in its post-hearing brief, albeit briefly. Dkt. 68 at 4–5.

Police may impound a vehicle and perform an inventory search where they have "'solid, non-investigatory reasons'" to impound the vehicle. *United States v. Davis*, 909 F.3d 9 at 17 (1st Cir. 2018) (quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 786 (1st Cir. 1991)). Those reasons may include so-called "community caretaking," which encompasses protecting vehicles from vandalism, removing traffic obstructions, protecting public safety and convenience, and managing police liability, among other concerns. *Davis*, 909 F.3d at 16. Courts consider the totality of the circumstances when evaluating officer decisions to impound vehicles, so a reasonable impoundment may outweigh possible investigatory motives or less intrusive methods to address the vehicle. *Id.* (citing *Rodriguez-Morales*, 929 F.2d at 786).

Villa contends that from the moment Salgado declined to arrest Villa on the street at his sister's home, Salgado sought to gather evidence from the vehicle. Dkt. 69 at 2. Salgado testified that he and Rebollo waited to execute the arrest warrant out of security concerns. The parties also engaged in a back-and-forth over the size and physical appearance of Villa's minor son and whether he constituted an imposing presence or looked like a gangly adolescent. Ultimately, the police may execute an arrest warrant where they choose, and the decision to wait for a more contained or controlled environment does not defeat the subsequent application of the community caretaking provision. The police decision to impound the vehicle and drive it to Metro Office Park, which Villa challenges as exploiting the law, constitutes an acceptable exercise of discretion. The Supreme Court held in *Bertine* that it would not second-guess the decision to impound a van rather

than parking it and locking it in a highly accessible public parking lot nearby. *Bertine*, 479 U.S. at 387.

Here, Salgado could have parked and locked the vehicle in the very parking lot in which he executed the arrest warrant but, like the officer in *Bertine*, chose to impound the vehicle. At the suppression hearing, Salgado explained his choice to impound the car was based on the busy location and the number of officers available to him. Villa acknowledged the highly public location of the arrest, which occurred at the largest shopping mall in the Caribbean, but disputed Salgado's decision not to leave an officer with the car and his minor son. Ultimately, I credit Salgado's explanation that he had only four officers available to him, had to assume custody of the minor after arresting his father, and had an arrestee and two police vehicles to return to Metro Office Park, and was in the center of a busy, public space. *See Jaynes*, 824 F.3d at 197 (where defendant would be detained indeterminately and with no one available to take immediate possession, police are justified in impounding vehicle); *see also Vega-Encarnacion v. Babilonia*, 344 F.3d 37, 41 (1st Cir. 2003) ("[W]here a driver is arrested and there is no one immediately on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car."). Even if Salgado harbored investigatory motives at that time, his decision to impound the vehicle satisfies the community caretaking requirements.

"Once a vehicle is impounded, the Fourth Amendment further permits police to conduct an 'inventory search' to identify the contents of the vehicle without first obtaining a warrant." *Davis*, 909 F.3d at 17. Because police lawfully impounded the vehicle, officers may follow procedure by conducting an inventory search. Salgado testified that inventory searches are part of DEA procedure as well. Villa raises the point, though, that Salgado had no intent of keeping the vehicle in DEA custody despite impounding it. Dkt. 69 at 5. Still, there is not a time limit qualifying how long police must retain custody of a vehicle before conducting an inventory search. Villa contends that Salgado should not have conducted the inventory search because, once Villa's sister arrived, he could have turned the vehicle over immediately and it would not have been in police custody. Dkt. 69 at 5. This ignores the time in which the vehicle had already been in police custody which

gave rise to the liability concern that can justify inventory searches. The very purpose of the search is to "make a record to protect the police against a later claim that custodial negligence allowed the loss of valuable personal property by theft or otherwise." *Jaynes*, 824 F.3d at 197. Imposing a waiting period prior to the search would expose police to claims of negligence and theft, thus defeating the point of taking inventory. Salgado testified that it is DEA policy to conduct an inventory search of a vehicle regardless of whether he has a search warrant or a signed consent to search form. Dkt. 62 at 34:8–15. Salgado, when asked at the suppression hearing if he was "required to do [an inventory] search before releasing the vehicle to a third party," answered affirmatively. *Id.* at 62:5–7.

Villa further argues that the inventory search exceeded its authorized scope when Salgado entered the glovebox. Dkt. 69 at 6. Salgado testified that, prior to the search, Villa told him that the glove compartment would not open. Dkt. 61 at 14:14–15. When Salgado first attempted to open it and could not, Villa told him not to try because it wouldn't open. *Id.* at 14:21–23. An inventory search is not carte blanche to take a vehicle apart, but it may follow standard police procedure and serve to protect the vehicle owner's property. *Bertine*, 479 U.S. at 372; *see, e.g.*, *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998) (searching behind the door panel of a car exceeds the scope of an inventory search).

Villa's argument that the government failed to introduce a form or other official notes from inventory search procedure is more compelling. Dkt. 69 at 5. Villa contends that Salgado ought to have employed the PPR-128 form or something similar because Salgado is a PRPD officer and the PPR-128 lays out the specific parts of a vehicle to be examined in an inventory search. *See* Dkt. 69-1 (PPR-128); Dkt. 71 (certified translation of PPR-128). In *Cruz-Rivera*, the PRPD officers searched in accordance with the PPR-128. *See, e.g.*, *Cruz-Rivera*, 465 F. Supp. 2d at 108–10. On the other hand, those officers were not members of the DEA Task Force, which conceivably might use different forms. The government did not address the concern that proper procedure might not have been followed or whether PRPD or DEA procedure was used. The absence of any form or notes detailing the search is troubling and calls into question the procedural aspect of the search.

It is good practice for law enforcement to record any search activity in notes or using official forms to demonstrate adherence to procedure.

The Supreme Court, however, held that the scope of an inventory search includes the unlocked glovebox of a vehicle because it protected the owner's property, protected police liability, and protected police from potential danger. *Bertine*, 479 U.S. at 382 (citing *Opperman*, 428 U.S. at 369). According to Salgado, a typical inventory search included the seats, door compartments, trunk, glovebox, floor mats, and anywhere a normal person could have access inside a vehicle. Though jammed, the glovebox was unlocked and so fits squarely within the scope of an inventory search. Salgado did not cross a line by cajoling the compartment open. *Cf. United States v. Cruz-Rivera*, 465 F. Supp. 2d 89, 109–112 (P.R.D. 2006) (finding PRPD use of an electronic machine to open a secured compartment inside a car's backseat to be within the scope of an inventory search). Because Salgado validly exercised his discretion to take the vehicle into police custody, the inventory search pursuant was a valid search pursuant to the inventory search exceptions to the Fourth Amendment warrant requirement. The fruits of the search should be admissible at trial.

Because I find that Villa lacked a reasonable expectation of privacy *and* that the inventory search was constitutional, the motion to suppress evidence obtained through the search of the vehicle should be denied. For the same reasons, I do not need to address Villa's argument that his consent to the vehicle search was coerced.

**Apartment Search**

Villa next contends that the search warrant executed at his residence on July 18, 2018 was unlawful. Villa argues that there was no probable cause to issue the warrant and that the affidavit omitted information the magistrate judge needed to evaluate probable cause. Dkt. 28 at 4, 6. The government contends that the motion to suppress should be denied because Villa did not establish a reasonable expectation of privacy and because the magistrate judge properly issued the warrant.

There is no Fourth Amendment protection for an individual who does not have a reasonable expectation of privacy in the property searched. *See Rakas*, 439 U.S. at 148. The government cites a decades-old case from the First Circuit for the proposition that "'ownership alone is not enough

to establish a reasonable and legitimate expectation of privacy.'" *United States v. Miller*, 636 F.2d 850, 854 (1st Cir. 1980) (quoting *United States v. Dall*, 608 F.2d 910, 914 (1st Cir. 1979), cert. denied, 445 U.S. 918 (1980)). The government contends that Villa's failure to prove his reasonable expectation of privacy in his residence precludes him from Fourth Amendment protections. *Dall*, however, concerned a locked camper cap on a pickup truck and *Miller* applied it to twenty tons of swordfish. *See Miller*, 636 F.2d at 853–54. Villa's circumstances are different. The Fourth Amendment explicitly protects the right of an individual to be secure in his home, as opposed to in a stranger's camper or U-Haul filled with coolers of fish. *See Dall*, 608 F.2d at 914; *Miller*, 636 F.2d at 853–54.

At its core, the Fourth Amendment protects the right of an individual to be free from unreasonable governmental intrusion in his own home. *Kyllo v. United States*, 533 U.S. 27, 31 (2001). Villa's ownership of the Guaynabo residence in addition to strong constitutional protections for the home satisfy the subjective and objective prongs to show his reasonable expectation of privacy in the home. The true controversy is over whether the search warrant was deficient; it was not.

A defendant must make a "substantial preliminary showing" that an omission in the warrant affidavit led the magistrate to issue a warrant that otherwise would not have issued. He must prove knowledge or reckless disregard by a preponderance of the evidence. *See Franks*, 438 U.S. at 171. Villa alleges that misrepresentation of the confidential source's information constitutes such an omission. Unlike an anonymous tip, which cannot give rise probable cause without additional corroboration, *see Florida v. J.L.*, 529 U.S. 266 (anonymous tip without corroboration is not enough for reasonable suspicion that a crime has been committed), a confidential source's tips hold more weight. The First Circuit has identified several factors to guide the examination of a tip's dependability, including: (1) whether there is "a sufficient basis for crediting the informant's reliability and his basis for knowledge of the facts supplied," *United States v. Croto*, 570 F.3d 11, 14 (1st Cir. 2009); "(2) whether [the] informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable

and practicable (e.g., through police surveillance); and (4) whether a law enforcement [officer] assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information," *United States v. Gifford*, 727 F.3d 92, 99 (1st Cir. 2013). The affidavit described as "reliable" the confidential DEA source who stated that Villa "kept money, firearms and drugs in his residence." Dkt. 28-2 at 4. The source would carry more weight if Rebollo had explained why the DEA believed the source to be reliable and how the source had learned the information, but the DEA still sufficiently corroborated the source's information.

Villa's sister and son confirmed Villa's address for Rebollo, and he stated that in his warrant affidavit. Dkt. 28-2 at 3–4. In doing so, Villa's sister and son partially corroborated the source's information. Moreover, as the affidavit attested, the vehicle in Villa's possession, in addition to drug evidence, contained phone bills addressed to him at that Guaynabo address as well as the beeper for access to the complex's parking lot. In short, the presence of both drugs and the residence's access beeper in the same vehicle supported the magistrate judge's finding of a nexus between a drug crime and Villa's home. In addition, it was heard for the first time at trial that Salgado and other unnamed agents visited the apartment at least twice prior to Villa's arrest. *See* Dkt. 62 at 39:11–20, at 41:6–42:8. These visits, if at all significant, demonstrate Salgado's belief in the confidential source's information. These factors weigh equally, and stronger evidence for one may offset weaker evidence for another. *United States v. Zayas-Díaz*, 95 F.3d 105, 111 (1st Cir. 1996). The first factors appear deficient, with Rebollo calling the source "reliable" but offering little support for why. However, evidence obtained from Salgado, the vehicle, Villa's sister, and Villa's son all corroborated Villa's address. Rebollo, in the curriculum vitae section of his affidavit, described his experience law enforcement training in Quantico, Virginia and firsthand experience on illegal drug trafficking investigations in Puerto Rico, supporting his ability to analyze the reliability of the source's information.

The magistrate judge, then, had corroborating evidence and applied common sense to determine the confidential source's credibility regarding the drugs tip. *Cf. United States v. Shelton*, 490 F.3d 74, 79 (1st Cir. 2007). Probable cause requires a judge to examine the totality of the

circumstances. *See Gates*, 462 U.S. at 235, 239. Villa's indictment for a drug-related conspiracy and Rebollo's experience in investigating drug crimes must be considered. Villa, in light of the same facts, does not meet his heavy *Franks* burden to show that there was an alleged omission or, if there were, that it would have altered the outcome in this case.

In his post-hearing brief, Villa also argues that the fruits of the apartment search should be suppressed because they are derived from the illegal search of his vehicle. Dkt. 69 at 9. Because there was no reasonable expectation of privacy in the vehicle and the inventory search was constitutional, this argument has no basis.

## CONCLUSION

For the foregoing reasons, the motion should be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 1st day of July, 2019.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge